IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JASON PAUL MAPLE,                      )
                                       )
                    Petitioner,        )        Civil Action No. 17-529
                                       )
         v.                            )        Judge Cathy Bissoon
                                       )
MICHAEL R. CLARK,                      )        Magistrate Judge Patricia L. Dodge
                                       )
                    Respondent.        )

## MEMORANDUM AND ORDER

### I. MEMORANDUM

On April 24, 2017, Jason Paul Maple ("Petitioner") filed a Petition under 28 U.S.C.

§ 2254 for Writ of Habeas Corpus by a Person in State Custody, ("Petition," Doc. 1.)   Michael

R. Clark ("Respondent") was given several extensions to answer the Petition, but before he did

so, on August 21, 2017, Petitioner filed an Amended Petition, ("Amended Petition," Doc. 25).

Respondent filed his Answer on September 20, 2017, ("Answer," Doc. 21).[1]  After being granted

leave to do so, Petitioner filed Petitioner's Reply to Respondent's Answer on October 26, 2017,

("Reply," Doc. 24), and then, on April 9, 2018, he filed a Supplement in Support of Petitioner's

Reply to Respondent's Answer, ("Supplemental Reply," Doc. 28).

Shortly thereafter, on May 15, 2018, Magistrate Judge Mitchell issued a Report and

Recommendation, ("R&R," Doc. 29), recommending that the Amended Petition be dismissed

---

[1] Attached to Respondent's Answer is an Appendix with the relevant state court records.  A
Table of Contents appears at pages 51–55, followed by several attachments containing the state
court records which have consecutively numbered pages, each with the designation "App."
When citing to these records, the Court will use the "App" page designations.

and a certificate of appealability denied.[2]  On July 2, 2018, Petitioner's Objections to Magistrate

Judge's Report and Recommendation, ("Objections," Doc. 32), were docketed.

After a *de novo* review of the pleadings and documents in the case, together with the

R&R and the Objections thereto, the R&R will be adopted in part and rejected in part.  For the

reasons that follow, the Amended Petition will be granted as to ground one.

A.     **BACKGROUND**

Petitioner is serving a sentence of life without parole following his conviction by a jury

of first-degree murder, aggravated assault with serious bodily injury, and other violent offenses.

(Amended Petition at 1.)  As the history of Petitioner's case in the Pennsylvania courts is critical

to evaluating the grounds raised in the Amended Petition, it will be memorialized in detail

below.

1.     **State Proceedings**

On July 29, 2006, Petitioner was charged by criminal information with first-degree

murder, criminal attempt to commit murder, aggravated assault, and conspiracy to commit

murder and robbery.  (App. 88–91.)  All the charges arise out of events culminating in the death

of William Teck, ("Mr. Teck"), in the early morning hours of May 30, 2006.  (App. 88.)

At the preliminary hearing on the charges, Detective Terrence A. Kuhns, ("Detective

Kuhns"), a detective with twenty years of experience with the Westmoreland County District

Attorney's Office, testified regarding the investigation and initial questioning of Petitioner on

May 30, 2006.  (App. 160–207.)   Detective Kuhns brought with him and played a tape-recorded

---

[2] This case was reassigned to Magistrate Judge Dodge on June 7, 2019, following Magistrate
Judge Mitchell's retirement.  (Doc. 35.)

statement made by Petitioner at approximately 10:30 pm on May 30, 2006.  (App. 164–190.)
During the tape-recorded statement, Petitioner admits to shooting Mr. Teck. (App. 175–78.)

On cross-examination, Detective Kuhns states that Petitioner was a suspect and was
brought to the District Attorney's office for an interview by six law enforcement officers.  (App.
191–92.)  When questioning began, Petitioner denied knowing anything about Mr. Teck's
murder.  (App. 194.)   Later, "at some point" during questioning, Petitioner stated he wanted to
tell the truth, and Detective Kuhns confirmed Petitioner then "proceeded to tell [him] the truth
prior to the taped statement in a manner very similar to what the information contained in this
taped statement."  (App. 195.)  When asked by counsel, "Now once he's told you . . . once he's
admitted to you that he shot William Teck that's when you ask him . . . won't put the cart before
the horse.  That's when you advise him of his Miranda warnings, correct?," Detective Kuhns
responded affirmatively.  (App. 196; see also App. 417–18 (Detective Kuhns's supplemental
interview report memorializing Miranda warnings given after Petitioner's initial inculpatory
statement).  Detective Kuhns also stated he made efforts to find out how much alcohol Petitioner
had been drinking prior to the shooting and that Petitioner told him it was "a lot" and that he was
"really drunk."  (App. 199–200; see also App. 417–18 (Detective Kuhns's supplemental
interview report stating Petitioner was "drinking the entire day on May 29, 2006 and into May
30, 2006.").)

Petitioner's trial counsel moved to suppress Petitioner's initial inculpatory statements and
his tape-recorded statement as being obtained in violation of Miranda v. Arizona, 384 U.S. 436
(1966) and Missouri v. Siebert, 542 U.S. 600 (2004).  (App. 214–16 (suppression motion); App.
223–33 (supporting brief).)  A hearing on the motion was held on December 20, 2006, during
which Detective Kuhns again testified, though his testimony changed as to some important

3

issues.  Trial counsel filed a supplemental brief following the hearing, summarizing all testimony from the hearing and supporting evidence, (App. 383–390; 400–03),[3]  and addressing Detective Kuhns's testimony at the motion hearing.  (App. 396–403.)

On May 21, 2007, the trial judge denied Petitioner's suppression motion, finding he was not in custody when he made the initial statement and validly waived his <u>Miranda</u> rights prior to making the tape-recorded statement.  (App. 439–43.)

a.    Trial and Direct Appeal

Petitioner went to trial on the charges and was found guilty on September 16, 2008.[4] (App. 449–50 (verdict forms).)    At the trial, Petitioner's recorded statement was played for the jury, and a transcription was admitted into evidence as an exhibit.  (App. 1197 n.2.)  Following admission of that evidence, Petitioner testified on his own behalf. (App. 907; <u>see also</u> App. 2913 –3071 (transcript of Petitioner's trial testimony).)

On November 24, 2008, Petitioner's post-trial motions were denied and he was sentenced to life in prison without the possibility of parole for killing Mr. Teck, to be served consecutive and concurrent 12 to 23 years' incarceration for the other crimes of conviction.  (App. 467–72 (sentencing orders); <u>Id.</u> at 490–92 (pronouncement of sentence).)  On December 19, 2008, Petitioner appealed.  (App. 498.)

---

[3] This includes, the Miranda Form Petitioner completed on May 30, 2006, which reveals that after Petitioner confirmed he understood his rights, in response to the question " Do you wish to exercise any of these rights at this time?," the word "Yes" is circled, and next to it, the word "YES" is also handwritten. (App. 419.)  The Form is signed by Petitioner, as well as by Detective Kuhns and Detective Zupan.  (<u>Id.</u>)  Petitioner's taped-recorded statement was taken immediately following completion of the Form.
[4] An earlier trial, in May of 2008, ended in a mistrial after the trial judge found a member of the victim's family tampered with the jury.  (App. 561.)

The facts of the case brought out at Petitioner's trial were summarized by the

Pennsylvania Superior Court (and noted in the R&R) as follows:

> At approximately 4:00 a.m. on May 30, 2006, William Teck and Patrick Altman were walking along railroad tracks in Manor, Pennsylvania. Mr. Teck and Mr. Altman had been staying at the residence of Jennifer Vinsek, who was Appellant's girlfriend and Mr. Altman's cousin. Appellant shot and killed Mr. Teck with a shotgun and then fired his weapon at Mr. Altman. While Mr. Altman was not struck with a bullet, he dropped a bag that he was carrying as he fled the scene.

> Appellant's accomplices in the crime included Jennifer Vinsek, Dewayne Shank, Dewayne's brother Nathan Shank, and Ryan Bronowski. Following the shootings, Nathan removed a backpack from Mr. Teck's body, and Appellant retrieved Mr. Altman's abandoned bag. Dewayne, Nathan, and Bronowski testified against Appellant at trial. The Commonwealth witnesses also included Mr. Altman, Amy Kujawa, who was Vinsek's roommate, and Robert Johnson, a friend of Ms. Kujawa and Vinsek.

> The motivation for the crimes generated from events that started about one week prior to the shooting on May 23, 2006. At that time, Mr. Johnson inadvertently walked in on Vinsek and Mr. Teck engaged in consensual sexual intercourse at Ms. Kujawa's and Vinsek's residence on 12 B Division Street, Greensburg, Pennsylvania. On Thursday, May 25, 2006, Vinsek left with Appellant to go camping, where they stayed until May 29, 2006. During their camping trip, Vinsek told Appellant that Mr. Teck had assaulted and attempted to rape her.

> When Vinsek and Appellant returned to Greensburg on May 29, 2006, they went to Vinsek's apartment, which was in disarray. Vinsek claimed that Mr. Teck and Mr. Altman were responsible for the damage and that they also had stolen items. Vinsek and Appellant immediately tracked down Mr. Teck and Mr. Altman, who were drinking at Clear Waterz Bar in Greensburg, where Ms. Kujawa worked as a bartender. At about 12:30 a.m. on May 30, 2006, Appellant and Vinsek confronted the two men and, at approximately 1:00 a.m., were ejected from Clear Waterz Bar by the owner.

> Appellant and Vinsek then returned to 12B Division Street and contacted police to report that a burglary had occurred. Greensburg Police Officers Donald Sarsfield and Kerry Dieter responded to the

burglary report. Mr. Johnson was present because he had seen Mr. Teck and Mr. Altman at the apartment during the day of May 29, 2006.  Vinsek informed police that Mr. Altman and Mr. Teck burglarized her apartment and that Mr. Teck had attempted to rape her the previous week. In the presence of Police Officer Sarsfield, Police Officer Dieter, and Mr. Johnson, Appellant threated to retaliate against Mr. Teck and Mr. Altman.

After Officers Dieter and Sarsfield left Vinsek's apartment, Appellant contacted Dewayne Shank and asked him for assistance in confronting Mr. Teck and Mr. Altman. Appellant told Dewayne to enlist the aid of Nathan Shank and Bronowski and informed the Shank brothers that Mr. Teck had guns, money, and drugs in his backpack, and that he wanted to retaliate against Mr. Teck and Mr. Altman for certain crimes that they had committed against Vinsek. Appellant promised the Shanks that they could keep the guns, money, and drugs in Mr. Teck's possession in return for their assistance.

While Appellant was arranging for help, Mr. Teck and Mr. Altman left Clear Waterz Bar and went to Manor Diner. Vinsek located the two men through Ms. Kujawa. Nathan, Dewayne, and Bronowski drove to Manor and rendezvoused with Appellant and Vinsek. Vinsek then induced Ms. Kujawa to invite Mr. Teck and Mr. Altman to a party at 12B Division Street so that the two victims, who did not have a vehicle, would leave the diner to walk to Greensburg. When the two men left Manor Diner and started out toward Greensburg along the railroad tracks, Appellant followed the two men and fired his shotgun twice at them, killing Mr. Teck.

(App. 1536–37.)

In his appeal brief filed May 13, 2009, Petitioner renewed his argument that the trial court had erred in failing to find a <u>Miranda</u> violation and in declining to suppress Petitioner's two inculpatory statements.  (App. 501; <u>see also</u> App. 564–66 (facts relevant to issue in Appellant's Brief); <u>id.</u> at 569–80 (argument).)  In its brief, the Commonwealth argued that Petitioner was not in custody, but even if his <u>Miranda</u> rights were violated, the error was harmless.  (App. 645.) Specifically, the Commonwealth argued:

> Maple took the witness stand at trial, and told the jury essentially the same thing he told the detectives in both his initial statement

> and his taped statement.  He ran after Teck and shot at him twice.
> Accordingly, Maple can no longer challenge the ruling on the
> suppression court; any error committed by Judge Pezze is
> considered harmless.

(App. 647.)

In his Reply brief, Petitioner addressed the issue of harmlessness as follows:

> Appellant testified regarding his statement only after the
> prosecution introduced the wrongfully obtained confession.  The
> Court should not consider simply whether Appellant testified, but
> why he was required to do so.  If testimony is given in order to
> present a defense to the confession or to overcome the impact of
> the improperly introduced confession, 'then his testimony was
> tainted by the same illegality that rendered the confessions
> themselves inadmissible.'

(App. 679 (quoting Harrison v. United States, 392 U.S. 319, 223 (1968).)  Petitioner stated "[i]n

order to overcome the effect of the improperly admitted statement, Appellant had no choice but

to testify."  (App. at 680.)

The Pennsylvania Superior Court issued its opinion on August 6, 2010.  (App. 699.)  As

to Petitioner's primary contention on appeal—that both of his confessions should have been

suppressed—the Court agreed.  (App. 704–14.)  It found Petitioner was in custody as of 9:05

p.m., before either confession was made, and that he should have been read his Miranda rights at

that time.  (App. 712–14.)  In concluding that the erroneous admission of the confessions was

harmless error, the Superior Court reasoned as follows:

> Appellant took the stand and essentially repeated verbatim the
> statement that he gave the police on May 30, 2006.  While
> testifying, he merely expanded on the narrative that he gave to
> police by setting forth the details of his alcohol consumption and
> the specifics regarding his provocation for shooting Mr. Teck and
> attempting to shoot Mr. Altman.  Thus, the erroneously-admitted
> confessions were cumulative of other substantially similar and
> untainted evidence.

(App. 716.)   The Superior Court also concluded that the "properly-admitted, uncontradicted" evidence of Petitioner's guilt was "so overwhelming and the prejudicial effect of the admission of his statements was so insignificant by comparison to the evidence that the fact that Appellant's statements were introduced into evidence could not have contributed to the verdict." (App. 723.)   One judge wrote "separately to emphasize my reluctance to find harmless error where the Majority has acknowledged that a constitutionally infirm confession was improperly admitted into evidence."  (App. 731 (Musmanno, J., concurring).)  Petitioner sought rehearing *en banc*, but the application for rehearing was denied on October 25, 2010.  (App. 756.)

Petitioner did not initially appeal the Superior Court decision.[5]

c.        First PCRA Petition

On June 30, 2011, Petitioner filed a *pro se* Petition under Pennsylvania's Post Conviction Relief Act ("PCRA") and requested appointment of counsel.  (App. 733–53.)  Counsel was appointed and an Amended PCRA Petition ("First PCRA Petition") was filed on March 19, 2012.  (App. 755–849.)

As a preliminary matter, the First PCRA Petition details the failure of trial counsel to timely file a Petition for Allowance of Appeal, ("PAA"), with the Pennsylvania Supreme Court. (App. 757–66.)  Petitioner requested leave to file a PAA *nunc pro tunc*.  (App. 766.)

Relevant here, Petitioner's primary argument was that trial counsel was ineffective for failing to call an expert witness to testify regarding Petitioner's alcoholism and the impact of alcohol intoxication on cognition and the ability to form intent.  (App. 776–82.)  The

---

[5] Petitioner was given leave to file an appeal *nunc pro tunc* on January 3, 2013, (Doc. 1187), and the Pennsylvania Supreme Court denied his Petition for Allowance of Appeal on December 31, 2014.  (App. 1264.)

Commonwealth filed a short Answer to the First PCRA Petition on May 21, 2012.  (App. 850–52.)

A hearing was held on the First PCRA Petition on August 23, 2013.  During the hearing, Petitioner testified that he took the stand at his trial on the advice of counsel to "to bring in the alcohol, the drinking that weekend."  (App. 907 (transcript of hearing on First PCRA Petition).) Petitioner represented that trial counsel had discussed getting an expert witness "[a]s far as the alcohol, diminished capacity," but that he never interacted with such an expert in preparation for trial.[6]  (App. 908–09.)

Professor Bruce Antkowiak ("Professor Antkowiak") also testified on behalf of Petitioner at the hearing.  Professor Antkowiak offered that trial counsel's strategy "essentially just simply overlooked another viable defense that was clearly available in this case but was not meaningfully pursued which was the defense of voluntary intoxication which would have authorized the jury to not acquit, obviously, but simply to find a verdict on the murder count of no higher than third degree murder."  (App. 939.)  Professor Antkowiak also offered testimony on how critical an expert was to making out the voluntary intoxication defense.  (App. 944–47.)

Petitioner also offered the testimony of Dr. Mark King, ("Dr. King").  Dr. King indicated that he reviewed records, interviewed Petitioner and formed the opinion that Petitioner is an alcoholic and was at the time of the murder. (App. 981–86.)  Dr. King also gave expert testimony about how alcohol impacts an alcoholic's brain differently than a non-alcoholic's brain, including that the "cognitive impairment, lack of judgment, lack of ability to form intent is

---

[6] Petitioner's mother, Susan Maple, also testified at the hearing on the First PCRA Petition.  She represented that she and her husband had paid a $10,000 retainer for a psychiatrist, Lawson Bernstein.  (App. 896–97.)  The check was initially cashed but the entire retainer was later returned to her after no services were rendered.  (App. 896.)

significantly more so for an alcoholic who is drinking than a non-alcoholic who just happened to drink." (App. 987–92; see also id. at 987 ("So, you could do a lot of rote things without cognitive ability to assess them, to make judgments about them in a blackout state.").)   Dr. King testified, that if Petitioner accurately represented the quantity of alcohol he consumed, that at the time of the shooting, Petitioner's "intent would have been impaired.  That doesn't mean he has no intent, but his intention would not be specific, it would be impaired." (App. 1006.)  Dr. King testified he would have been available to testify at Petitioner's trial if he had been called.  (App. 992.)

The record was held open for Petitioner's trial counsel to testify and a second hearing on the First PCRA Petition took place on September 30, 2013.[7]  (App. 1020.)  At that hearing, trial counsel testified that "I was of the opinion that I would be able to establish for a jury sufficient evidence to raise a valid involuntary intoxication defense.  However . . . I did not once actually consult with an expert on that issue."  (App. 1025.)  Trial counsel testified that "perhaps hubris" had made him "over confident" in his "ability to persuade a jury that this was a crime of passion."  (App. 1027.)  Trial counsel offered that Petitioner was "very hesitant" to testify at trial but that if their defense was "you were so drunk you didn't know what you were doing" then testifying was in his best interest.  (App. 1029.)  Trial counsel testified that Petitioner was the only witness he presented with respect to the voluntary intoxication defense.[8]  (App. 1029–30.)

---

[7] Petitioner's PCRA counsel had locate and subpoena trial counsel, who had moved to Grand Junction, Colorado, after being disciplined and suspended from the practice of law for one year and one day by the Supreme Court of Pennsylvania, effective December 22, 2011.  (App. 1181; see also Office of Disciplinary Counsel v. Mark D. Lancaster, No. 1750, Disciplinary Docket No. 3, No. 78 DB 2010 (Allegheny County).)

[8] At Petitioner's first trial, trial counsel presented evidence related to Defendant's use of alcohol, particularly on the weekend leading up to the shooting, through his girlfriend at the time, Jennifer Vinsek.  Ms. Vinsek declined to testify at Petitioner's second trial.  At the hearing, trial counsel stated "[t]here were no other witnesses" when asked "So you really had no other witness to put on to put the evidence of the voluntary intoxication before the jury other than Jason?." (App. 1029–30.)

On redirect, trial counsel stated he "didn't even think about" retaining an expert to explain the "blackouts" Petitioner testified about to the jury.  (App. 1048–49.)

When questioned about the defenses he presented—voluntary manslaughter and voluntary intoxication—being in tension, trial counsel offered "[i]t was a discorded defense, and I don't think I ever sat through an analyzed it and thought it through."  (App. 1031–32.)   In closing on the issue of defenses presented, trial counsel offered that "there was no firm basis to argue on a voluntary manslaughter charge."  (App. 1033; see also App. 1044 ("I failed to consider specific intent is also one of the elements of voluntary manslaughter. . . . I realized [after closing arguments] that I made a grievous error.").)

With respect to filing the PAA, trial counsel confirmed that he had promised to file the PAA and that he failed to do so.  (App. 1034–35.)  Counsel offered that there was no reason "whatsoever" for his failure to do so and agreed that he "dropped the ball on that."  (App. 1035.)

Both Petitioner and the Commonwealth filed supplemental briefing after the hearing. (App. 1065 (Petitioner's Brief); App.1161 (Commonwealth's Brief).)

On January 3, 2014, Judge Blahevoc of the Westmoreland County Court of Common Pleas issued his ruling with respect to the First PRCA Petition.  On the issue of the PAA, Judge Blahevoc found that trial counsel "was ineffective for failing to file the PAA" and ordered Petitioner be permitted to proceed with filing a PAA *nunc pro tunc*.  (Doc. 1187–88.)

On the issue of trial counsel's failure to call an expert related to the voluntary intoxication defense, Judge Blahevoc reasoned as follows:

> This Court finds that while the claim has arguable merit; the petitioner cannot establish prongs two and three of the ineffectiveness test: namely that there was no reasonable basis for counsel's failure to do so; and that he was prejudiced.

11

> Mr. Lancaster testified that he was presenting a dual defense of voluntary intoxication and voluntary manslaughter.  He called defendant as a witness who testified regarding the enormous amounts of alcohol he drank leading up to the shooting.  Moreover, the proposed expert witness could not testify with certainty that Mr. Maple lacked a specific intent to kill.  Therefore, defendant was not prejudiced by Mr. Lancaster's failure to call an expert witness.

(App. 1187.)

> d.     Reinstatement of Direct Appeal

Petitioner's PCRA counsel filed a PAA on January 30, 2014.  (App. 1189.)   In the PAA, Petitioner adopted the facts relayed by the Superior Court, but also offered argument on "two important matters" overlooked in that recitation.  (App. 1197.)  First, Petitioner noted that three of the eye-witnesses at his trial were also charged with criminal homicide (and two had been previously convicted of *crimen falsi* offenses).  (Id.)  Thus, the jury was charged that they were "corrupt sources" and their testimony should be evaluated carefully.  (Id.)  Second, Petitioner emphasized that this trial testimony was materially different from his confessions to police: he testified he lacked a "plan or intention to shoot the victim" and he elaborated on the enormous quantity of alcohol he drank over the holiday weekend leading up to the shooting[9] and his history of alcoholic blackouts.  (Id.)

Substantively, Petitioner sought review of the Superior Court's conclusion that admission of this statements obtained in violation of Miranda was harmless error.  (App. 1199.)  Petitioner challenged the Superior Court's conclusion that other "properly admitted and uncontradicted

---

[9] Petitioner's testimony was that on Friday he and his girlfriend "drank a case of beer, 2 bottles of wine, and 3/4 bottle of Jack Daniel [sic]," that he finished the bottom of Jack Daniel's and "drank and indeterminate but large amount of beer on Saturday, that he drank beer all day and had a few shots at a bar on Sunday , and that he began drinking beer from a keg on Monday afternoon and continued the remainder of the day.  (App. 1197–98.)

evidence" was overwhelming, and that the Superior Court's holding was in conflict with United States Supreme Court precedent on the issue.[10]  (Id.)

On June 12, 2014, the Pennsylvania Supreme Court denied the PAA.  (App. 1264.)

e.      Second PCRA Petition

On December 31, 2014, Petitioner's PCRA counsel filed a Second PCRA Petition with the previously raised substantive claims in order to obtain a final determination on them for appeal.  (App. 1265.)  Petitioner's argument that trial counsel was ineffective for failing to call an expert witness to testify about his alcoholism and intent was presented in the Second PCRA Petition.  (App. 1267.)  Petitioner submitted that without an expert, his testimony, which was "replete with 'I don't know', 'I can't remember', and 'I blacked out,'" came across as evasive rather than that he "was immersed in a blackout episode," causing prejudice.  (App. 1277.)  The Commonwealth filed an Answer to the Second PCRA Petition on June 3, 2015.  (App. 1292.)  Argument was held on the Second PCRA Petition on July 14, 2015.[11]  (App. 1315.)

In Petitioner's brief in support of his Second PCRA Petition, he elaborates on how he was prejudiced by trial counsel's failure to present an expert regarding alcohol intoxication and cognition.  (App. 1316–18.)  In particular, Petitioner argued for the first time that the "need for an expert witness was heightened in this case because petitioner was an alcoholic who may not have appeared intoxicated to others."  (App. 1318.)  Petitioner noted two police officers who testified that Petitioner had been drinking, but did not appear intoxicated, and that one officer offered expert testimony on how intoxicated persons present with "'slurred speech, bloodshot, glassy eyes" and noted that when "they walk, they stagger."  (App. 1319–20 (testimony of

---

[10] Petitioner's argument on this point is primarily based on Arizona v. Fulminante, 499 U.S. 279, 296 (1991).

[11] A transcript of this hearing does not appear in the Appendix.

13

Officer Sarsfield).)  The officer opined that Petitioner was not intoxicated because he did not

exhibit those signs.  (App. 1320.)  PCRA counsel closed on the issue that "failure to call an

expert witness to explain if and why an alcoholic may appear to lay observers to be functioning

normally when, in reality, he was immersed in a blackout episode caused prejudice." (App.

1331.)

The Opinion and Order on Petitioner's Second PCRA Petition was issued on November

3, 2015.  (App. 1360.)  In rejecting Petitioner's arguments, the Court of Common Pleas judge

reasoned:

> This Court finds that Maple's recollection of the events shows that
> Maple killed Mr. Teck willfully, deliberately, and with
> premeditation.  Maple was aware of his actions and any alcohol he
> consumed did not prevent him from forming the specific intent to
> kill.
> …
> Although Dr. King's testimony may have been helpful to show that
> Maple's intent may have been impaired, this Court finds that
> Maple's own recollection clearly demonstrates Maple's intent to
> kill Mr. Teck.  This Court finds that notwithstanding trial counsel's
> failure to call the expert witness to testify the outcome would not
> have been different, and Maple was not prejudiced as a result.

(App. 1368.)  Petitioner appealed on November 30, 2015.  (App. 1371.)

Petitioner filed a brief in support of his appeal with the Superior Court on April 18, 2016.

(App. 1377.)  The Commonwealth filed a brief on July 14, 2016.  (App. 1497.)

On March 13, 2017 the Superior Court issued its Opinion, rejecting Petitioner's

arguments regarding an expert.  (App. 1536.)  First, the Superior Court concluded that:

> The certified record refutes Appellant's contention regarding the
> need for expert testimony regarding alcohol intoxication and
> impairment.  As the Commonwealth points out, Officers Sarsfield
> and Dieter, Robert Johnson, Dewayne Shank, Nathan Shank, and
> Ryan Bronowski all had contact with Appellant on the night of the
> shooting and testified that Appellant appeared to be sober.

> Moreover, Appellant never testified as to the quantity of alcohol he
> consumed during the relevant period."

(App. 1542–43.)  The Superior Court added a footnote indicating that Petitioner acknowledged

that "witnesses for the prosecution testified that he did not appear to be intoxicated on the night

of the shooting."  (App. 1543 n.2.)

Second, the Superior Court determined that Petitioner's claim that "Dr. King's testimony

was needed to explain his memory loss appears contrary to the facts."  The Court elaborated:

> Even if we assumed, for purposes of argument, that Dr. King
> advanced a plausible theory to explain an alcoholic's memory loss,
> despite the individual's performance of habitual and routine acts,
> the proffered opinion does not explain the facts before us.  Here,
> the evidence showed that Appellant's conduct on the night in
> question involved planning and deliberation and was not routine
> and habitual. . . . The substantial evidence of planning and
> premeditation compels us to conclude that Dr. King's testimony
> would not have helped to establish a voluntary intoxication defense
> in this case.

(App. 1543–44.)

## 2.    Magistrate Judge's Report and Recommendation

The Amended Petition lays out five grounds for relief, (Amended Petition at 18), and the

Magistrate Judge concluded that grounds two, four, and five were procedurally defaulted and

that Petitioner has not made the requisite showing to overcome that default.  (See R&R at 3

(grounds), 6 (default analysis).)  The undersigned agrees with the Magistrate Judge's conclusions

with respect to those grounds and will adopt that portion of the R&R.

The Magistrate Judge reviewed the remaining two grounds and found both previously

presented to the Pennsylvania courts, and thus reviewable.[12]  The Amended Petition's first

ground for review reads:

> The trial Court's error in failing to suppress a confession that was
> illegally obtained by Detectives in violation of Miranda and
> introducing it into evidence at Petitioner's trial(s) was not
> Rendered harmless error by Petitioner taking the witness stand and
> testifying in his own behalf, as the erroneous admitted confession
> had a 'substantial and injurious effect or influence' on the jury and
> their verdict.

(Amended Petition at App'x F.)

The second exhausted issue presented in the Amended Petition as the third ground for

relief, reads:

> In presenting a defense of voluntary intoxication, trial Counsel was
> ineffective by failing to exhaust his obligations as Counsel and
> perform an objectively reasonable investigation into, obtain, and
> present expert witness testimony regarding alcoholism and the
> impact of alcohol intoxication on cognition and the ability to form
> the specific intent to kill, as expert witness testimony is the only
> relevant evidence when demonstrating a defense of voluntary
> intoxication which tends to mitigate a degree of homicide from
> first to third degree.

(Id. at App'x H.)

As to the first ground, the Magistrate Judge concluded that "while we do not believe that

a Miranda issue existed, even accepting the determination that Miranda was implicated, the

record conclusively supports the conclusion of the Superior Court that error if it occurred was

harmless under federal standards."  (R&R at 11.)  As to the third ground presented in the

---

[12] An issue is exhausted, and reviewable by a federal court, if it has been fairly presented to the
state's highest court on either direct appeal or on collateral review.  Castille v. Peoples, 489 U.S.
346, 350–51 (1989).  The first ground was exhausted on direct appeal, and the third ground in
Petitioner's PCRA Petitions.

Amended Petition, the Magistrate Judge determined "there is nothing in the record to suggest that petitioner was intoxicated at the time of the homicide. Indeed the evidence suggested just the opposite." (Id.) Thus, the Magistrate Judge recommended the Amended Petition and a certificate of appealability each be denied. (Id.)

Petitioner filed lengthy Objections to the R&R. As to the first ground, Petitioner argued that the Magistrate Judge misapprehended his claim for relief, and instead substituted his own judgment—that there was no Miranda violation—for that of the Superior Court, which concluded Petitioner's Miranda rights had been violated. (Objections at 3–4.) Petitioner also challenged Magistrate Judge's review of the harmlessness of the Miranda violation. (Id. at 5–18.) With respect to the third ground, Petitioner took issue with the Magistrate Judge's conclusion that the record was devoid of evidence that Petitioner was intoxicated at the time of the homicide. (Id. at 29–32.) Thus, Petitioner contended expert testimony was relevant and, his counsel's failure to present such evidence at trial, counsel was ineffective under Strickland. (Objections at 32–40 (citing Strickland v. Washington, 466 U.S. 668 (1984).)

**B.    ANALYSIS**

The Court first considers Petitioner's first ground for relief. (Amended Petition at App'x F.) Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a petition for a writ of habeas corpus shall not be granted with respect to any claim adjudicated on the merits "unless adjudication of the claim [in State court] (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). For purposes of § 2254(d)(1), "clearly established Federal

law" includes only United States Supreme Court decisions issued prior to the state court's denial of relief.  Greene v. Fisher, 565 U.S. 34, 40 (2011).

Whether the state court recognized the error or not, the impact of the Constitutional error is analyzed under the Brecht standard.  Fry v. Pliler, 551 U.S. 112, 121–22 (2007) (holding "substantial and injurious effect" standard of Brecht v. Abrahamson, 507 U.S. 619 (1993) applies in § 2254 proceedings); see also Davis v. Ayala, 135 S. Ct. 2187, 2199 (2015) ("[A] prisoner who seeks federal habeas corpus relief must satisfy Brecht, and if the state court adjudicated his claim on the merits, the Brecht test subsumes the limitations imposed by AEDPA.").  "The State bears the burden of proving that an error passes muster under this standard."  Brecht, 507 U.S. at 630; Harrison, 392 U.S. at 225–26.  Under Brecht, if the Court has "grave doubt" about the effect of an error on the jury, it should treat the error as non-harmless. O'Neal v. McAninch, 513 U.S. 432, (1995).  However, "when a state court determines that a constitutional violation is harmless, a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable."  Fry, 551 U.S. at 119 (referencing Mitchell v. Esparza, 540 U.S. 12 (2003) (emphasis original)).

If a state's highest court does not substantively address the issue being reviewed, the district court should "look through" to the "last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning."  Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).  The State may rebut this showing with alternate grounds for affirmance.  Id.

Here, the Pennsylvania Supreme Court denied review, (App. 1264), and therefore, we "look through" to the relevant opinion by the Superior Court.  (App. 699–732.)  The Superior Court held the Miranda violation was harmless for two reasons.

18

> First, Appellant took the stand and essentially repeated verbatim the statement that he gave the police on May 30, 2006. While testifying, he merely expanded on the narrative that he gave to police by setting forth the details of his alcohol consumption and the specifics regarding his provocation for shooting Mr. Teck and attempting to shoot Mr. Altman. Thus, the erroneously-admitted confessions were cumulative of other substantially similar and untainted evidence.

(App. 716.)  And second, the Superior Court determined:

> All this properly-admitted, uncontradicted evidence of Appellant's guilt was so overwhelming and the prejudicial effect of the admission of his statements was so insignificant by comparison to that evidence that the fact that Appellant's statements were introduced into evidence could not have contributed to the verdict.

(App. 723.)

Before this Court, the Commonwealth has not provided alternate grounds for affirmance.

Wilson, 138 S. Ct. at 1192.  Rather, it has wholesale adopted the Superior Court's reasoning:

> In regard to the Superior Court finding that the admission of Petitioner's confession was harmless error, the Respondent agrees with the reasoning of the Court in its August 6, 2010 memorandum opinion, to the extent IF this Court finds that the confession was unconstitutionally obtained, and adopts the same argument to this Court.

(Doc. 21 at 18; see also id. at 18–22 (pasting Superior Court's reasoning regarding Petitioner's testimony verbatim into brief).)

### 1.    Unreasonable application of Federal law

Petitioner urges that the Superior Court's first justification for its harmless error determination is contrary to Federal law.[13]  In Harrison v. United States, the Supreme Court

---

[13] With respect to the underlying Miranda violation, the Court agrees with Petitioner that, if the Commonwealth wished to challenge the Superior Court's finding, it should have pursued that argument on direct appeal.  (Doc. 32 at 3-4.)  Because the Commonwealth did not do so, the determination is entitled to this Court's deference, and the undersigned finds no reason to disturb it.  Rather, the issue presented by Petitioner is the harmless error determination.  (Id.)

reversed defendant's conviction after finding that his "trial testimony was the inadmissible fruit of [ ] illegally procured confessions."  392 U.S. 219, 221 (1968).[14]

In Harrison, the defendant was charged with felony murder. 392 U.S. at 220. Defendant made three confessions which were used in evidence in his trial, and he testified after the confessions were admitted.  Id.  He was found guilty, but on appeal, his convictions were reversed after the court of appeals determined that his confessions were illegally obtained. Id. At the defendant's second trial, the prosecution did not introduce the confession, but it did introduce the defendant's trial testimony from the first trial. Id. at 221.  The defendant was again convicted, and this conviction was upheld by the court of appeals. Id.

The Supreme Court held that because the defendant testified only after the illegally obtained evidence was wrongfully introduced at trial, his testimony was fruit of the poisonous tree.  Id. at 222 ("If [defendant testified] in order to overcome the impact of confessions illegally obtained and hence improperly introduced, then his testimony was tainted by the same illegality that rendered the confessions themselves inadmissible."). Under such circumstances, the Supreme Court found it was improper to "demand a demonstration by a petitioner that he would not have testified as he did if his inadmissible confessions had not been used."  Id. at 224. Rather, "the Government must show that its illegal action did not induce [defendant's] testimony" in order to purge the taint of illegality.  Id. at 225–26.  As the Government failed to do so in the case before it, the judgment of conviction was reversed. Id. at 226.

Under Harrison, Petitioner's trial testimony is similarly tainted.  Petitioner testified after the prosecution used his illegally obtained confessions, (App. 679), and Petitioner argued on

---

[14] In his Reply to the Superior Court, Petitioner's trial counsel argued Petitioner's trial testimony was tainted by the same illegality and cited Harrison.  (App. 677–81.)

appeal and here that he did so at least in part to "overcome the impact of confessions illegally obtained and hence improperly introduced." Harrison, 392 U.S. at 223.  Thus, his trial testimony cannot excuse the Constitutional violation; it is part and parcel of the same Constitutional harm.

In response to the Amended Petition, the Commonwealth has not presented evidence to demonstrate "its illegal action did not induce his testimony" nor (as noted above) has it provided any alternate grounds for affirmance of the Superior Court's harmless error determination. Harrison, 392 U.S. at 225.  Petitioner's trial testimony thus cannot be considered to be either "substantially similar and untainted evidence" or "properly-admitted, uncontradicted" evidence of guilt as found by the Superior Court.

### 2.    Harmlessness under Brecht

Therefore, this Court must conduct its own harmless error analysis and consider:

> the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of corroborating or contradicting the testimony of the witness on material points, the extent cross-examination was permitted, and, of course, the overall strength of the prosecution's case.

Johnson v. Superintendent Fayette SCI, 949 F.3d 791, 799 (3d Cir. 2020) (quoting Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986)); see also Johnson, 949 F.3d at 799 n.5 (finding the factors discussed in Van Arsdall apply to a court reviewing a for harmless error under Brecht). After careful consideration of all of these factors, the Court concludes that admission of Petitioner's testimony—including both of his confessions in violation of Miranda and his "testimony impelled thereby" at trial—"had a substantial and injurious effect or influence in determining the jury's verdict." Harrison, 392 U.S. at 222; Brecht, 507 U.S. at 637.

Three considerations drive the Court's conclusion.  First, and as Judge Musmanno noted in the concurring opinion to the Superior Court's opinion on direct appeal:

21

> [a] confession is like no other evidence.  Indeed, 'the defendant's
> own confession is probably the most probative and damaging
> evidence that can be admitted again him….[T]he admissions of a
> defendant come from the actor himself, the most knowledgeable
> and unimpeachable source of information about his past conduct.
> Certainly, confessions have profound impact on the jury, so much
> so that we may justifiably doubt its ability to put them out of mind
> even if told to do so.'  Bruton v. United States, 391 U.S., at 139–40
> (White, J., dissenting); see also Cruz v. New York, 481 U.S. at 195
> (White, J., dissenting) (citing Bruton).  While some statements by a
> defendant may concern isolated aspects the crime or may be
> incriminating when linked to other evidence, a full confession in
> which the defendant discloses the motive for and means of the
> crime may tempt the jury to rely upon that evidence alone in
> reaching its decision.  In the case of a coerced confession . . . the
> risk that the confession is unreliable, coupled with the profound
> impact that the confession has upon the jury, requires a reviewing
> court to exercise extreme caution before determining that the
> admission of the confession at trial was harmless.

Arizona v. Fulminante, 499 U.S. 279, 296 (1991).  In this instant case, the jury was made aware

that Petitioner *three times admitted* that he shot the victim.  After hearing he confessed to

officers, the jury heard the subsequent tape-recorded statement of Petitioner's second confession

and were given a transcript of the recording to take back with them when they deliberated.  The

jury saw Petitioner confess to shooting Mr. Teck at trial.  Each one of these admissions were

tainted by illegality of the first, and they were contrary to Petitioner's Constitutional rights.

Simply put, this Court has "grave doubt" that these statements were not prejudicial.  O'Neal v.

McAninch, 513 U.S. 432, 438–39 (1995).

Second, while the Court is not inclined to speculate about how Petitioner's trial may have

proceeded without these pieces of evidence, there is no doubt that it could have been

dramatically different.  One way in which it could have been different relates to the third ground

for relief in the Amended Petition—whether trial counsel was ineffective for failing to present an

expert as to the issue of alcoholism, cognition and intent in connection with Petitioner's

voluntary intoxication defense.  At the hearing on the First PCRA Petition, trial counsel admitted

that Petitioner was the *only* witness he used to put on evidence about the voluntary intoxication

defense.  (App. 1029–30.)  If Petitioner had not testified in order to mitigate against his coerced

confessions, his counsel may have explored other avenues to present the defense (or, would have

risked a finding of ineffectiveness for not presenting the defense *at all*).  However, if the

prosecution had neither of Petitioner's confessions nor his trial testimony, it is possible defense

counsel may have pursued an entirely different type of defense—one which could have led to

acquittal, rather than just mitigating the most serious charges in the case.

This is just one example of how pervasive the effect of removing the tainted testimony

could have been on the entirety of Petitioner's trial; the Court can think of many others.  All this

to say, the impact of removing Petitioner's confessions and testimony from the trial is so

significant, that "the error itself had substantial influence" on the verdict.  Kotteakos v. United

States, 328 U.S. 750, 765 (1946) ("The inquiry cannot be merely whether there was enough to

support the result, apart from the phase affected by the error.  It is rather, even so, whether the

error itself had substantial influence.  If so, or if one is left in grave doubt, the conviction cannot

stand.").

Finally, while the Commonwealth had other strong evidence, there is also no doubt that

Petitioner's confessions and his trial testimony are of the highest importance for the most serious

convictions in the case.   The Superior Court's analysis made clear that the "other substantially

similar and untainted evidence" to the "erroneously-admitted confessions" consisted entirely of

statements made by Petitioner at trial.  (App. 716).  Without the trial testimony and the

confessions, the prosecution lacks direct evidence on critical issues, including intent.  With

respect to the Commonwealth's other eyewitnesses, at least three were charged by the trial judge

as "corrupt sources" under Pennsylvania law, and thus their testimony must be evaluated with caution.  (App. 1189); see Commonwealth v. Williams, 732 A.2d 1167, 1181 (Pa. 1999) (holding that the instruction is "indicated in cases in which the evidence is sufficient to present a jury question with respect to whether the Commonwealth's witness is an accomplice").  Without Petitioner's coerced confessions and testimony to corroborate the accounts of those witnesses, it is much more likely the jury would doubt their testimony.  See Johnson, 949 F.3d at 799 (highlighting factors including importance of witness testimony, cumulative nature of testimony, and corroborating effects for consideration in assessing an error's harmlessness).

For these reasons, the Court will grant the Amended Petition as to this ground.

### 3.      Ground Three: Expert Witness

Briefly, Petitioner's third ground does not provide an independent basis for relief.  While this Court agrees with Judge Blahevoc that this claim has "arguable merit," (App. 1187), it cannot say that the Superior Court's conclusions are unreasonable with respect to an expert related to the voluntary intoxication defense.  (App. 1542–43); see also 28 U.S.C. § 2254(d)(2).

While Petitioner maintained that he was "blacked out" at the time of the killing, there were a number of other witnesses that testified that he did not appear to be intoxicated.  (Id.) While Petitioner urges that an expert witness is necessary to explain why lay witnesses could think Petitioner—an alcoholic person in a blackout—appeared sober, it is reasonable to conclude, as the Superior Court did, that the lay witnesses thought Petitioner was sober *because he was*.  In the latter event, an expert would not have been necessary or helpful, and thus, Petitioner could not have been prejudiced by his counsel's failure to obtain one.  Strickland, 446 U.S. at 687.

## II. <u>ORDER</u>

The Magistrate Judge's Report and Recommendation, (Doc. 29), is **ADOPTED IN PART** and **REJECTED IN PART**.   Grounds two, four, and five of the Amended Petition are barred as procedurally defaulted, and relief is **DENIED** as to ground three.   The Amended Petition is **GRANTED** with respect to ground one, and Petitioner's conviction is **VACATED**; Respondent shall **RELEASE** Petitioner from custody unless, within 120 days from the date of this Order, the Commonwealth of Pennsylvania grants Petitioner a new trial.

This Order is **STAYED** until post-judgment motions and appeals are final or the time to file such motions and appeals expires.

IT IS SO ORDERED.

June 30, 2020                                          s\Cathy Bissoon
                                                               Cathy Bissoon
                                                               United States District Judge

cc (via Electronic Filing):

All Counsel of Record

cc (via First-Class U.S. Mail):

Jason Paul Maple
HV-3555
SCI Mercer
801 Butler Pike
Mercer, PA 16137